## Tunis Ryerson and Another v. Samuel D. Eldred and Others.

*Assignment of property by reference to schedule.* Where debtors make an assignment to a trustee for their creditors, of their property as described in a schedule attached, only such property passes as is there described.

*Assignment treated as void by the parties: Rights of a purchaser from the assignee.* Where an assignment, ostensibly for the benefit of creditors, was treated as void by all the parties thereto, and A., one of the assignors, entered into a contract with the others, with the knowledge of the assignee, that they should convey a certain piece of the joint property to him, and that in consideration thereof, A. should pay the joint debts, and also make certain payments to the other assignors, and under that contract he went on and made large payments to creditors, and improved the property: *Held,* that B. and C., who were not creditors, and who, with knowledge of this contract, bought the property described therein from the assignee and from such other assignors, were bound by the contract, and might be compelled to carry it into effect by deeding over to A. the rights acquired by their purchase.

*Accounting in such case.* A. in such case should account to B. and C. for such moneys paid by them on their purchase as had been actually applied on the joint debts which A. by his contract was to pay, and B. and C. should account to A. for the rents and profits of the land for the time they had occupied it under their purchase.

*Landlord and tenant: Purchase by tenant of adverse claim.* One who is in possession of land as tenant of another, cannot buy in an adverse title which existed at the time he received his lease, and make such purchase the basis of a suit in equity to quiet his title as against his landlord. The possession acquired by means of the lease must be surrendered before the tenant is in position to dispute the title under which he entered.

*Persons not parties to suit, not concluded by an accounting.* When an accounting is had in a suit in equity, persons incidentally interested therein, but who are not parties to the suit, are not concluded thereby.

*Heard October 20th and 21st, 1868. Decided January 11th.*

Appeal in Chancery from Muskegon Circuit.

The bill in this cause was filed by complainants to restrain Samuel D. Eldred, one of the defendants, from proceeding under the Forcible Entry and Detainer act to remove them from certain premises, and to compel him to release his claim of title to the same.

Eldred filed his cross-bill, setting up his title to the same. Proofs were taken in both cases, and the cases were heard together. The Court made a decree granting the relief prayed by the bill, and dismissed the cross-bill.

*L. Patterson*, and *Moore & Griffin*, for complainants in original bill.

*Edwin Potter, John T. Holmes*, and *G. V. N. Lothrop*, for complainants in cross bill.

CHRISTIANCY J.

Samuel D. Eldred, of Muskegon, Michigan (one of the defendants in the original, and complainant in the cross bill), together with Orson P. Eldred, Nelson Eldred, and Joseph H. Way, of Illinois, having been engaged in the business of selling lumber at Chebanse and Prospect City, Illinois, under the style of J. H. Way & Co., and at Kan-kakee, Illinois, under the style of N. Eldred & Co., were also engaged, from 1856 to 1859, at Muskegon Lake, in Michigan, in the manufacture of lumber, under the style of Eldred, Way & Co., and being somewhat embarrassed with debts, on the 15th of July, 1859, seem to have undertaken to make a real or pretended assignment to Frederick S. Eldred, of Janesville, Wisconsin; and on that day executed to him an instrument purporting to assign and transfer to him (not all their property generally, but) all their property mentioned in the schedule of property attached, for the benefit (not of all their creditors generally, but) of all their creditors mentioned in the schedule of debts attached, which included debts to the amount of about $9,000. Whether the property described or attempted to be described in the schedule included all their partnership property; does not distinctly appear by the evidence, though it does appear that it did not include all the individual property of the several assignors, nor does it appear that the debts mentioned in the schedule were all the debts owed by the said firms, though the evidence authorizes an inference that the whole amount of debts was not included in the schedule.

The property assigned consisted of lumber and other personal property, notes, accounts, &c., of real estate, situate

in Iowa, Illinois, and Michigan, and possibly intended to include, among others in the latter State, some five acres at Muskegon Lake, with a steam saw mill and other buildings thereon, known as the mill property, and which is the subject of controversy in these cases. The only description in the schedule which could possibly apply to this was "five acres of land in Muskegon County, State of Michigan, more particularly described in deed of Eben Smith, Jr., to Nelson Eldred and others, and recorded in Liber M. of Deeds, on page 455, in Ottawa County, valued at $15,000." The original bill alleges that this mill property was conveyed by Samuel Wood and wife to Samuel D. Eldred, and a mortgage given back for the purchase money, and this is admitted by the answer of S. D. Eldred; and there is nothing in the pleadings or proofs to show that it was ever owned or conveyed by Smith; and, so far as appears, Samuel D. Eldred never conveyed it, unless the assignment operated as a conveyance. The least, therefore, that can be said, is that the correctness of the description of this mill property does not appear; and there is at least an inference that the description, by reference to the Smith deed, is incorrect, or that the deed conveyed some other property. It does not, therefore, appear (admitting the assignment to be in all other respects valid) that this property was conveyed to the assignee.

The description of the lands in Illinois is simply "Fourteen and a half lots of land in Kankakee City, Kankakee County, Illinois, valued at $5,400," and "Two-sevenths of 1,600 acres of land in Green County, Illinois, at $2,500." That in Iowa is described merely as "One hundred and twenty acres of land in Chickasaw County, Iowa, valued at $600."

These descriptions of land, in Illinois and Iowa, are too uncertain and vague to make the assignment operate as a transfer of title (had it been in all other respects well executed), at least, without clear evidence that the assignors

owned certain lands in the city, or counties named, which might fall within the description used, and that *these* were the only lands owned by them in such city or county.

There are other defects in the assignment. In form it is drawn in *tripartite,* as if to be executed by the assignors, of the first part, the assignee, of the second part, and the creditors, of the third part. The instrument itself is signed only by the assignors. No creditor signs it, nor does it appear that it was ever known to the creditors. It con- tains an express covenant on the part of the assignee to perform the trust. He does not, however, execute the instrument, but signs an instrument purporting to accept the trust, and appointing Nelson Eldred, of Kankakee, Illinois, and Samuel D. Eldred, of Muskegon, his agents, with full power to perform all acts in relation to the trusts which he might perform if present. The only acknowledg- ment of the instrument, is in the following words: "Ac- knowledged by Samuel D. Eldred, this 5th day of December, A. D. 1859, before me, Theodore Davis, Justice of the Peace."

This was not a sufficient acknowledgment, even as to Samuel D. Eldred, to authorize the instrument to be re- corded. It seems however to have been put upon record by Samuel D. Eldred. The assignment expressly authorized the assignee to sell on credit, and was therefore fraudulent and void as against creditors, at their option, — (*Sutton v. Hanford, 11 Mich. 513*)—though they might doubtless have waived this by claiming under the assignment, which it does not appear they ever did.

The assignee does not appear to have taken any charge or control, in fact, of any of the assigned property. He re- sided at Janesville, Wisconsin; and it does not appear he ever saw any of the assigned property or gave any instruc- tions in reference to its sale or management. No change whatever in relation to the actual control and management of the property seems to have taken place in consequence

of the assignment, except in such matters of mere form as will presently be noticed. It is hardly probable from the assignment itself, and the evidence in reference to it, that the assignment was at the time of its execution considered of any actual validity by any of the parties. If so, they seem very soon after to have treated and considered it of no validity, and continued so to treat it, until the attempted sale to Ryerson and Johnson hereafter to be noticed. It would seem to have been executed only as a kind of blind to ward off creditors, in case they (the firm) could not otherwise avoid a sacrifice of their property, for there appears to have been at all times an honest intention and a real anxiety on the part of all the assignors to pay the creditors as fast as practicable, from the proceeds and the use of the property.

Samuel D., who resided at Muskegon, appears to have had entire control of the mill property; and immediately after the assignment, for the purpose already indicated, and to preserve an appearance of consistency, he seems to have commenced keeping his accounts, and doing other business, and executing papers in the name of Frederick S. Eldred, by himself as Agent; and this course seems to have been continued as to much, if not most, of the business, after his contract of purchase presently to be noticed, and until August, 1862, when he went into the army.

But on April 1, 1860, the assignors all appearing to regard the assignment as invalid, entered into a contract under seal, by which all the other assignors agree to sell to Samuel D. Eldred, all the property and assets of the several firms (including of course the mill property), in consideration of which said Samuel D. by the same contract agreed, among other things, to pay all the debts of the said several firms; and when his contract should be complied with, the other parties were to convey to him all the real estate by good warranty deed. The assignee, Frederick S. Eldred, was informed of this contract and made no objection whatever, but silently acquiesced.

Under this agreement, Samuel D. Eldred proceeded to dispose of portions of the property and to pay debts; and in making the sale of some 500 acres of pine land (which seems to have stood in the name of all the partners), all the assignors joined in a warranty deed to the purchaser, who, however, for greater security, required that a quit claim deed should be obtained from Frederick S. Eldred, the assignee. This was prepared by Samuel D., and forwarded to the assignee, who at once executed and returned it to him in a letter in which he says "yours with deed is at hand. I have executed the same and ret. The expense is one dollar. Rufus has given me a note against your Company for $380, which he wants the money on very much, as he is about buying a farm in Iowa. Please let me know what you can do about it." It is thus quite clear that the assignee did not look upon this sale in any respect as his, and expected to have Samuel D. refund the expense. He says nothing, and claims nothing of the proceeds of the sale.

Samuel D. continued to dispose of property and to pay debts; and from the use of the mill, the sale of property and otherwise, had, prior to his leaving in August, paid a large amount of the debts, between $5,000 and $6,000 at least, — (the whole amount for which the assignment had been made appeared to have been but about $9,000) — and in addition to this amount of debts paid, had also, up to the time last mentioned, expended in improvements upon the mill and mill property and taxes, over two thousand dollars; the precise sum we do not here attempt to fix.

After the agreement of sale to Samuel D., of April 1, 1860, Nelson Eldred became his agent for the management and disposition of the property in Illinois, fully recognizing him as the owner, and neither of the other assignors disputing his rights.

But in August, 1862, Samuel D. Eldred enlisted in the Union army for three years, and was much of the time stationed in Arkansas. Some time prior to this the mill had

been let to, and was then being run by one Steeley, for the season: the letting being probably in form, in the name of Frederick S. Eldred, by Samuel D. Eldred. When he went into the army he left his wife in the house on the mill property and in charge of it, and left Ryerson (one of complainants in original bill) as his agent to take charge of the business connected with the mill for that sawing season.

On March 11, 1863, Ryerson and Johnson (complainants in original bill) took a written lease of the entire mill property from Samuel D. Eldred for one year from January 1, 1863, the lease being dated back to that day. This is a full and formal lease by indenture under seal in the name of Samuel D. Eldred as lessor of the first part, and the lessees of the second part, executed on the part of the lessor by his wife, as his agent, who was duly authorized for that purpose. The rent to be paid was seven hundred dollars, a part of which was to be paid directly in satisfaction of a decree of foreclosure for one of the debts which Samuel D. Eldred, by his contract of purchase, was to pay. The lease contains a covenant on the part of the lessees against assigning or underletting without the written assent of the lessor, and a covenant to surrender and yield up to the lessor, the premises in good repair at the end of the term.

There is no evidence tending to show that there was any mistake on the part of the lessees in taking this lease from Samuel D. Eldred in his own. name, or that they supposed or believed it to be in the name of the assignee, by Samuel D. Eldred as agent; but it appears to have been knowingly and deliberately taken as a lease from Samuel D. Eldred, as lessor. Under this lease they went into possession. But during the term created by it, and while in possession under it, in the summer and fall of 1863, Ryerson & Johnson, the tenants, entered into negotiations with the other assignors (Nelson and O. P. Eldred and Way) for the purchase of the mill property; at first, with the expectation

on all hands that the deeds were to be executed by all the assignors, including Samuel D. Eldred. The other assignors had been urging Samuel D. to sell, in order to pay up the debts, while he, on the other hand, appears to have been unwilling to sell the whole of the mill property, at least upon the terms they proposed. And, though an attempt was made to show, by Nelson Eldred, that Samuel D. had consented he should sell as he deemed best, this entirely failed; as it was an attempt to show the contents of letters, not shown to have been lost or searched for. We, however, think it entirely clear that the other assignors, as well as Ryerson and Johnson, up to the time when Samuel D. refused to execute the deed which had been prepared and forwarded by Nelson Eldred to him for that purpose, all expected Samuel D. to join in the sale, and that it was not till they found he refused to do this, that any of them had thought of ignoring his rights in the property, or of treating the purchase of Ryerson and Johnson as a purchase from the assignee, which should cut off all the rights of Samuel D. We are also satisfied that before the purchase was completed (and we are inclined to think even before Samuel D. Eldred went into the army) Ryerson had notice of and understood the contract of purchase made by Samuel D. of April 1, 1860, and that he had been making payment in pursuance of that agreement.

But, finding that Samuel D. would not consent to the sale, the other assignors informed Ryerson that they could convey their shares, though they could not convey that of Samuel D., to which Ryerson replied he "would fight Samuel D. Eldred's share;" whereupon, on the 29th October, 1863, O. P. Eldred, Nelson Eldred, and Joseph H. Way, with their wives, executed to Ryerson and Johnson a warranty deed, purporting, for the consideration of $5,625, to convey the undivided three-fourths of said mill property and five acres, which deed appears to have been acknowledged on the 7th November, 1863, and on the 20th of the same

month a quit-claim was obtained from the assignee. Four thousand dollars of the purchase money was paid down, fifty of which was retained by Nelson Eldred, as he says, for his services in the matter, and the balance sent to the assignee, some part of which he subsequently used in paying a foreclosure decree, on which the mill property would otherwise have been sold.

The original bill states the whole purchase price to be paid by Ryerson and Johnson at eight thousand dollars, one-half of which is alleged to have been paid down, and the balance ($4,000·) secured by a mortgage upon the property, payable in one year. But there is no evidence what the whole purchase price was to be, nor of any mortgage for any part of it. The $4,000 is all that is proved by the evidence, and there is no admission touching this matter in S. D. Eldred's answer or cross-bill.

The lease to Ryerson and Johnson having expired on the first day of January, 1864, and they refusing to give up the possession, Samuel D. Eldred, the lessor, through his agent, Ruddiman, commenced proceedings under chapter 150 Compiled Laws, for the recovery of the possession; whereupon Ryerson and Johnson filed the original bill to restrain these proceedings, and to compel a release from Samuel D. Eldred of all claim to the premises; to which he put in an answer, denying the validity of the assignment, or that it was ever understood or intended to be valid, setting up his contract of purchase and the lease, charging complainants with notice, &c., and filed his cross bill, asking that Ryerson and Johnson be decreed to release and convey to him; he declaring his readiness to pay the balance of the debts, as required by his contract.

There are many other matters appearing on the record; but the above are all we deem material to the rights of the parties, and which are at the same time satisfactorily proved.

From this statement we think it results: First, that even admitting the validity of the assignment in all other

respects, as between the parties to it, the complainants in the original bill have failed to show that they acquired any title by the assignee's deed, or that the mill property passed by the assignment to the assignee, for the reasons already stated, that it does not appear that the mill property was described in the schedule; and this could only be made to appear by showing that there was such a deed as the Smith deed referred to by the schedule, and that it contained a description of the mill property. The burden of proving this rested upon the complainants, claiming title through the assignee. And though this point is not expressly raised by the answer of S. D. Eldred, we can find nothing in his answer, when fairly construed, which can properly be taken as an admission of the correctness of this description; especially when it is construed with reference to the original bill itself, which would seem to give a different derivation of title from that indicated by the reference in the schedule.

Second. That, as to the deed from the other assignors, of the three-fourths of the mill property, the complainants have also failed to sustain their bill, for the reason (among others) that, even supposing the legal title to have been vested in the firm, (composed of all the assignors) — which does not appear — the complainants purchased with notice of the contract of April 1, 1860, by which the other assignors agreed to sell the property to Samuel D. Eldred, and with notice that he had been making payments in pursuance of that agreement.

This agreement was clear from all taint of fraud, and appears to have been made in entire good faith, and for the purpose of paying off *all* the debts of the several firms of which the parties were members — a purpose which Samuel D. Eldred appears to have pursued with fidelity, and considerable success. And we are inclined to think, though we do not here decide — that even if the assignment had been valid as between the parties, and, (as between them) conveyed this property to the assignee, yet being fraudulent

as against creditors, and the creditors never having claimed under the assignment, this agreement of April 1, 1860, known to, and acquiesced in, by the assignee, must, at least after the large payments made under it, as to all the parties to these suits, be treated as entirely valid; and that its validity could be disputed, if at all, only by creditors actually claiming under the assignment.

But third; there is another insuperable objection to sustaining the original bill of the complainants, whatever view may be taken of the assignment or the agreement of April 1, 1860. The title which they undertake to set up against Samuel D. Eldred under the assignment, if it amounts to any thing, was in its nature *adverse* to his, and must have existed, if at all, *prior to*, and *at the time* of the *lease* from Samuel D. Eldred to them. To set up this title against him is to deny his title as landlord at the time they took the lease. This lease was by indenture, under seal, and by means of this they obtained and enjoyed the possession undisturbed for the term, and by it they covenanted to restore to him the possession at the expiration of the term. They cannot, therefore, at least until they have restored the possession, be allowed to dispute his title as landlord at the time they took the lease, and to set up against him such adverse title — never asserted or claimed against them, but hunted up and acquired by them during the term, while in peaceable possession and enjoyment of the property under the lease. To permit this would be to open a wide door to frauds by tenants upon their landlords. If they could have set up at all against their lessor such a title thus obtained, they must first have restored the possession to him, so as to place him in *statu quo*, with all the advantages he would have possessed for contesting such adverse title, if the lease had never been made and he had never parted with the possession.—*Falkner v. Beers, 2 Doug. (Mich.) 117; Hodges v. Shields, 18 B. Mon. 828, 832;*

*Williams v. Garrison,* 29 Geo. 503 ; *Porter v. Mayfield,* 21 *Penn. St.* 264 ; *Thompson v. Clark,* 7 *Id.* 62 ; *Brown v. Keller,* 32 Ill. 151–155; and see *Miller v. Shackleford,* 4 *Dana,* 286 ; 4 *Bac. Abr. Lease, O.,* 189–197 ; *Great Falls Co. v. Worster,* 15 N. H. 412, 450.

It remains only to consider what, if any relief, Samuel D. Eldred is entitled to, under his cross-bill.

We think, upon the case made by the pleadings and proofs, he is entitled to a decree declaring the deed of the other assignors and of the assignee to Ryerson and Johnson utterly void and of no effect as against him ; and that he is entitled to be placed in the same position, as nearly as practicable, that he would have occupied had no such deeds been executed, and the premises been surrendered to him at the expiration of the lease.

That he is entitled to a fair compensation for the use of the mill property—that is to say, what the use of the property would have been worth to a prudent man with proper use after keeping it in reasonable repair, and paying such taxes as may have been paid by them—from the expiration of the lease up to the time possession shall be delivered or tendered to him, and that Ryerson and Johnson should be decreed to deliver the possession to him within thirty days after service upon them of a certified copy of this order.

And on the other hand Ryerson and Johnson must be allowed or repaid so much of the amount paid by them as purchase money to the other assignors and the assignee, as they ( Ryerson and Johnson ) shall be able to show has been actually applied and paid upon the indebtedness of the said several firms which Samuel D. Eldred, by his contract of purchase was to pay.

Proofs and an account must be taken in the court below ( or by reference from that court ) of the amount on the one side to be allowed to Samuel D. Eldred for such use of said property, and on the other of the amount of

debts of the said several firms paid from the purchase money as aforesaid. And this latter amount, when ascertained, or so much of it as may be required, must be applied in offset or liquidation of the amount found due to Samuel D. Eldred for such use of the premises. And if there should be any balance still due said Samuel D. for such use of the premises, then such balance must be paid to him by said Ryerson and Johnson. But if a balance shall be found due to the latter, it shall constitute a lien upon the interest which said Samuel D. acquired in this land by said contract, till paid; and said Samuel D. must be decreed to pay the same to said Ryerson and Johnson within three months after the date of the final decree therefor; and in default of such payment they to be at liberty to enforce such lien.

The other members of the firm, Nelson Eldred, Orson P. Eldred, and Joseph H. Way, being interested in the payment of the partnership debts, and in the full performance by Samuel D. Eldred of his part of the contract of purchase of April, 1, 1860, and they not being parties in either of these causes, no account can properly be taken of the payments made upon such partnership debts by Samuel D. nor can the question of full performance by him of his contract be determined, so as to bind them. But these are questions in which Ryerson and Johnson are not interested.

The decree of the Circuit Court must be reversed with costs, the original bill dismissed, and a decree of this court must be entered in accordance with the opinion above expressed. And the record must be remitted to the court below for such further proceedings as may be necessary to carry such decree into effect.

The other Justices concurred.